## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW MEXICO

### PACER Cover Sheet
### for Electronically Filed Documents

Any data shown here are current as of  06/10/06     . Any element of information on this form, except the received date, is subject to change as changes may be made to the Court's official docket.

**Case Title:**      LP Gas Equipment, Inc., et al. v. James Wayne Berry, et al.

**Case Number:**      03-01394

| Document Information |
|---|

**Description:**      Memorandum Opinion re: [9-1]First Amended Complaint .

Received on:      2006-04-17 14:15:14.000

**Date Filed:**      2006-04-17 00:00:00.000

**Date Entered On Docket:**      2006-04-17 00:00:00.000

| Filer Information |
|---|

**Submitted By:**      James Burke

**If this form is attached to the document identified above, it serves as an endorsed copy of the document as it existed on the above date.  To confirm that nothing has changed since then, review the docket.**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
JAMES WAYNE BERRY,
    Debtor.                     No. 7-03-16464 S

LP GAS EQUIPMENT, INC., et al.,
    Plaintiffs,
v.                           Adv. No. 03-1394 S

JAMES WAYNE BERRY, et al.,
    Defendants.

## MEMORANDUM OPINION

This matter came before the Court for trial of Plaintiffs' First Amended Complaint ("Complaint") to Recover Money Damages and for Determination Excepting Debt from Discharge. Plaintiffs appeared through their attorney Eaton & Krehbiel, P.C. (P. Scott Eaton). James Berry ("Defendant") appeared through his attorney Michael Allison. Defendant abandoned his counterclaim at trial. This is a core proceeding[1]. 28 U.S.C. § 157(b)(2)(I).

The Complaint seeks a determination that Plaintiffs' debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A),(4) and/or (6). Those sections provide:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt--
> ...

---

[1]The Complaint also names Berry, Inc. and Berry, LLC as co-defendants. There is no bankruptcy jurisdiction over those entities, as the claims do not arise in or under the bankruptcy code, and whether those entities are liable to Plaintiffs is not related to the bankruptcy case. Therefore, the claims against those two defendants will be dismissed without prejudice. <u>See Heagle v. Haug (In re Haug)</u>, 19 B.R. 223, 225 (Bankr. D. Or. 1982).

(2) for money, property, services, or an extension,
renewal, or refinancing of credit, to the extent
obtained by--
            (A) false pretenses, a false representation, or
            actual fraud, other than a statement respecting
            the debtor's or an insider's financial condition;
        ...
        [or]
        (4) for fraud or defalcation while acting in a
fiduciary capacity, embezzlement, or larceny;
        ...
        [or]
        (6) for willful and malicious injury by the debtor to
another entity or to the property of another entity[.]

        To succeed on a Section 523(a)(2)(A) claim, the creditor

must prove 1) the debtor made a false representation, 2) the

debtor made the representation with the intent to deceive the

creditor, and 3) the creditor relied on the representation.

Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th

Cir. 1996).  The creditor's reliance must have been justifiable.

Field v. Mans, 516 U.S. 59, 77 (1995).  Finally, the debtor's

representation must have caused the creditor to sustain the loss.

Young, 91 F.3d at 1373.  At trial, any doubts must be resolved in

the debtor's favor.  Chevy Chase Bank FSB v. Kukuk (In re Kukuk),

225 B.R. 778, 782 (10th Cir. BAP 1998).

        To succeed on a Section 523(a)(4) claim, the creditor must

prove one of three things: (1) fraud or defalcation while acting

as a fiduciary; (2) embezzlement; or (3) larceny.  No fiduciary

relationship is necessary for embezzlement or larceny.  Great

American Ins. Co. v. Graziano (In re Graziano), 35 B.R. 589, 593-

94 (Bankr. E.D. N.Y. 1983).

To succeed on a Section 523(a)(4) fiduciary duty claim, the creditor must prove (1) the existence of a fiduciary relationship between the debtor and the objecting creditor, and (2) a defalcation committed by the debtor in the course of that relationship. <u>Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)</u>, 216 B.R. 283, 286 (10th Cir. BAP 1997).

To succeed on a Section 523(a)(4) embezzlement claim a creditor must prove (1) entrustment to the debtor, of (2) property, (3) of another, (4) which the debtor appropriates for his or her own use, (5) with intent to defraud. <u>Adamo v. Scheller (In re Scheller)</u>, 265 B.R. 39, 53 (Bankr. S.D. N.Y. 2001). <u>See also</u> <u>Driggs v. Black (In re Black)</u>, 787 F.2d 503, 507 (10th Cir. 1986):

> "Embezzlement, for purposes of 11 U.S.C. § 523 'is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come, and it requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.' " <u>United States Life Title Insurance Co. v. Dohm (In re Dohm)</u>, 19 B.R. 134, 138 (Bankr. N.D. Ill.1982) (<u>quoting American Family Insurance Group v. Gumieny (In re Gumieny)</u>, 8 B.R. 602, 605 (Bankr. E.D. Wis.1981)).

Embezzlement requires that the original receipt or taking of the property be legal. <u>Scheller</u>, 265 B.R. at 54. The property taken must also be another's, because one cannot embezzle one's own property. <u>Id.</u>

To succeed on a Section 523(a)(4) larceny claim a creditor must prove (1) the wrongful taking, of (2) property, (3) of

Page -3-

another, (4) without the owner's consent, and (5) with the intent
to convert the property.  Id. at 53.  See also United States v.
Smith, 156 F.3d 1046, 1056 (10th Cir. 1998), cert. denied, 525
U.S. 1090 (1999)(citing Black's Law Dictionary 1477 (6th ed.
1990) defining "larceny" as the "[f]elonious stealing, taking and
carrying, leading, riding, or driving away with another's
personal property, with intent to convert it or to deprive owner
thereof.") Larceny requires that the original taking of the
property be unlawful[2].  Scheller, 265 B.R. at 54.  The property
taken must also be another's, because one cannot convert one's
own property.  Id.

To succeed on a Section 523(a)(6) claim a creditor must
prove a deliberate or intentional injury by the debtor to the
creditor or the creditor's property.  Kawaauhau v. Geiger, 523
U.S. 57, 61 (1998).  Proof of a deliberate or intentional act
that leads to injury is not sufficient.  Id.  Conversion, to be
nondischargeable, must be willful and malicious; mere technical
conversion is dischargeable.  C.I.T. Financial Services v. Posta
(In re Posta), 866 F.2d 364, 368 (10th Cir. 1989).

**FINDINGS OF FACT**

These findings of fact are based on the testimony elicited
in a 5 day bench trial conducted by two excellent lawyers that

---

[2] Larceny differs from embezzlement only with respect to the
manner in which the property comes into possession of the
wrongdoer.  Scheller, 265 B.R. at 54.

were extremely prepared and organized, supplemented by a lengthy deposition of Defendant, and thousands of pages of documentary evidence. The Court observed the demeanor of the witnesses and resolved many conflicting versions of what transpired. Overall, the Court found the witnesses to be credible, with the exception of Defendant, who uniformly said what he believed would minimize his damages. The Court gave the most weight to the testimony of Sarah Franklin and Richard Joliett, and gave the least weight to the testimony of Defendant.

Plaintiff LP Gas Equipment, Inc. ("LP") is a corporation owned 100% by co-plaintiffs Sarah Franklin and Tom Franklin. Defendant is the nephew of Sarah and Tom Franklin. The Franklins organized LP and began operating in 1986 as a hardware store for the LP Gas Industry. The Franklins personally owned the real estate on which LP operated. Due to hard work and conservative business practices, LP was profitable and paid the Franklins an average of $70,000 to $100,000 per year over the next ten years.

On February 5, 2002 the Plaintiffs filed suit against Defendant and his two wholly owned companies in state court alleging the same facts as alleged in this Complaint. After one and one-half years of litigation, Defendant Wayne Berry filed a voluntary chapter 7 proceeding in this Court. This adversary proceeding was timely filed.

Other than the Franklins, Defendant was LP's first employee. Defendant worked for over 10 years in sales. In 1996 Defendant entered a contract to purchase Cartwrights Plumbing ("Cartwrights") in Santa Fe, New Mexico. Defendant borrowed $30,000 from the Franklins to capitalize his new business. Defendant formed Berry, Inc. ("BI") to operate Cartwrights. Defendant also acquired the land on which Cartwrights operated through Berry, LLC ("LLC"). Defendant left LP and operated Cartwrights full time.

In September, 1996, Tom Franklin had a serious vehicle accident and suffered a traumatic brain injury. He never returned to work, is still in a wheelchair and has difficulties with the normal activities of daily living. While Tom was in rehabilitation, Defendant called Sarah and asked for a first option to buy LP, having heard that Sarah had received inquiries to purchase the business. Sarah agreed.

From 1996 to 1999 Sarah took over, to some extent, the operation of LP, assisted by her son Roger, Defendant's brother Russell and other employees. Sarah's background was not in the LP gas field, and she had a difficult time. Despite declining sales during this time, LP still had a profit because Sarah cut expenses, including lease payments to herself and Tom.

In early 1997 a lawsuit was filed against LP and others seeking over $1 million damages that resulted from a failed

valve.  LP's insurance carrier declined coverage.  The lawsuit took Sarah's time and focus from the business for the next several years.  During this time Russell was in "over his head" and also dealing with personal problems.

In 1999 LP had outgrown its building and decided to build a new headquarters on other land owned by the Franklins.  Tom and Sarah personally contracted with Luther Construction to build the building.  Construction commenced in October, 1999.  LP moved into its 1/3rd of the space on March 15, 2000; LP intended to rent the remainder of the space.

BI sold its interest in Cartwrights in the fall of 1999.

BI was a subcontractor to Luther Construction on LP's new building.  Sarah and Defendant had various conversations during the construction period about Defendant returning to LP.  One conversation dealt with Defendant acquiring the stock of LP.  He made an offer to Sarah of $350,000 for 100% of the stock.  She testified that she would not accept the $350,000 because she wanted to have LP valued first.  She had also had over ten other contacts about the business, and needed to conduct further research.  She never agreed to accept the $350,000 and does not believe that Defendant had any reason to believe that she had accepted.  All parties agreed that, with the $1 million lawsuit pending, this was not a good time to worry about transferring the stock.

Case 03-01394-s   Doc 34   Filed 04/17/06   Entered 04/17/06 14:59:00 Page 8 of 39

LP's December, 1999 end of year balance sheet showed current assets of $233,000 and total assets of $262,000. Current liabilities were $102,000 ($36,000 line of credit, $63,000 accounts payable, and $3,000 of taxes); long term liabilities were $55,000 on a note to shareholders; and stockholder equity was about $104,000. Total income for 1999 was $896,000. Net income was $31,000. In early 2000 LP owed $29,000 on the $100,000 line of credit and had no other debts except current payments to vendors.

In early 2000 Sarah and Defendant had more conversations about his returning to LP. After the years of declining sales, there was a consensus that the operations had to be turned around, mostly through an increase in sales. Sarah testified that Defendant understood it would be a full time position. Defendant wanted a salary of $70,000. Sarah negotiated a salary of $48,000 plus use of the company's truck.

On or about March 1, 2000, Defendant returned to LP to serve as president. Sarah testified that it was mutually understood that Defendant would devote his undivided attention to LP. He was put in charge of all day to day activities of LP. The Franklins told the employees that Defendant and his brother were buying the assets of LP. The purpose behind these moves was to give Defendant and Russell authority, and for Sarah to walk away. Over the coming months Defendant hired some new employees and

Page -8-

took steps to modernize LP's operations through automation, new telephone systems, internal accounting, and various other means. Rich Joliett was hired as comptroller in October, 2000. Sarah testified that there were no discussions or understandings about Defendant entering contracts with himself or his entities for any purposes.

In August, 2000 the $1 million dollar lawsuit settled, with no liability against LP. The Franklins had meanwhile been discussing various methods of transferring the stock to Defendant and Russell. One method involved gifting 51% of the stock to Defendant, with an accompanying restrictive operating agreement and a 2% of sales royalty to the Franklins. Under this method the Franklin's children were also to become partial owners; Defendant objected to this. Defendant also did not want to pay a royalty unless LP had a profit. None of the various methods ever proceeded to completion, however, and the Franklins remain 100% owners. Basically, the Court finds all of the various testimony regarding changing business forms and capitalization structures was irrelevant to the dischargeability issue; Defendant knew that he never held a single share of stock in LP.

Over the next year, Defendant and, to some extent the Franklins, sought out possible businesses to acquire to expand sales, inventory, and cash flow. None of the potential

acquisitions worked out.  The Court finds that these actions are irrelevant to this case also.

In September, 2000 LP had cash flow problems and the Franklins loaned $100,000 to LP.  Sarah testified that she was not surprised because of the workforce expansion and modernization of the office.

LP's December, 2000 end of year balance sheet[3] showed current assets of $445,000 and total assets of $525,000.  Current liabilities were $345,000 ($65,000 line of credit, $272,000 accounts payable, and $8,000 of taxes); long term liabilities were $58,000 on a note to shareholders; and stockholder equity was about $122,000.  Total income for 1999 was $1,401,000.  Net income was $22,000.

Despite modernizing the accounting system, it turned out that Defendant kept a separate LP check book, with a separate numbering system, locked in his office.  Many checks were written from this checkbook, without the documentation that was required for normal checks issued through the accounting system.  For months there had been an ongoing discussion between Defendant and the comptroller and Russell regarding these checks; because of

---

[3]In late 2001, Plaintiffs discovered material omissions and misstatements in this balance sheet and income statement.  E.g., the line of credit was understated by $100,000, approximately $74,000 of payables were omitted, and draws on the line of credit had been booked as revenues.  A correct accounting would have shown a significant operating loss for the year.

Page -10-

them it had been impossible to determine accurate bank balances and many checks had been returned for insufficient funds. During this time period LP also suffered delinquent tax penalties, NSF charges, and bank service fees. The situation became so bad that Richard Joliett had to call the bank on a daily basis to determine how much he could write in checks because he never knew how many or how much was outstanding from Defendant's LP checkbook.

One job LP had during Defendant's tenure was the Kirtland Air Base "Crash fire" project, which was a fire-fighting training school. LP had done similar previous schools and both sold the necessary equipment and provided the designs for the systems. Defendant did not tell Sarah that BI would be involved in the Crash fire project, and according to Sarah's testimony there was no need for BI to be involved. Mr. Bruce Sivers, the contractor on the Crash fire project assumed he was dealing with LP, never thought or assumed he was dealing with BI, and never received an invoice from BI. Yet, Defendant charged LP, and paid himself, management fees for the Crash fire project. There were also no written contracts between BI and LP for this or any other job. Sarah had no idea that any money was going to Defendant, BI, LLC, or anyone else outside of Defendant's regular paychecks. Sivers also testified that he purchased all materials and supplies directly from LP and, when necessary, used LP employees for

Case 03-01394-s   Doc 34   Filed 04/17/06   Entered 04/17/06 14:59:00 Page 12 of 39

labor.  When shown several of BI's invoices to LP for various tasks on the Crash fire project, Mr. Sivers had no idea why BI would be charging LP For work done by him or his company.

In the spring of 2001 LP located a tenant ("ACS") for the rest of the new building.  The Plaintiffs entered a contract with ACS for the build-out of the space.  LP agreed to do the build-out at cost, because the tenant improvements were going to improve the value of the building.  ACS agreed to pay $70,000 to LP, who would pay for the material and supplies and provide the labor for the build-out.  LP did provide the materials, supplies and labor but never received a check from ACS.  Patrick Padilla, representative of ACS, testified that actually $78,031.51 was paid to BI between March 29, 2001 and November 22, 2001, which included two months of rent in the total amount of $14,156.  The Court is not including this $78,031.51 in damages, however, because it appears that the misdirected payments went to BI, not Defendant.

During the summer of 2001 Sarah Franklin heard rumors that LP was on the verge of bankruptcy, and then discovered through the outside CPA firm that LP had invoices up to six months old to be paid.  Russell then told her not to pursue the stock transfer deals any further.  She became suspicious.  As a result, she asked the comptroller for a financial statement and copies of checks, and discovered that, indeed, the company was in bad

Page  -12-

shape. LP owed $265,000 to vendors, the payables were in the 90-120 day range, and LP owed $200,000 on lines of credit[4]. Sarah, who had paid LP's bills for years, also recognized that many of the checks were to unidentified/unrecognized payees. LP was on COD with every vendor. Sarah set up a meeting with Defendant, Russell, the comptroller, and other employees to discuss the situation. She demanded to know where the money was going, who is it was going to, and what it was going for. The meeting was short, and ended with Defendant leaving, but promising to document every transaction. He claimed that some documentation was in his office, but that most was at home. Despite promising several times to provide documents, he never did. Defendant never returned to the office except once, at an unknown time, to remove all of his file cabinets and personal papers. Some documentation was provided to Plaintiffs several days before the start of this trial, consisting of invoices from BI to LP that were not found in LP's records. Richard Joliett (the comptroller) testified that despite repeated requests for invoices and other documentation on checks and credit card transfers, Defendant never provided any and he never discovered any anywhere in the records at LP. Due to the timing and due to

---

[4]There had previously been only one $100,000 line of credit. It was unclear from the testimony how the second $100,000 line of credit was opened. Defendant attributed it to a bank error. Sarah only discovered its existence after Defendant left LP.

Page -13-

Defendant's failure to produce these documents in the state court case, the Court tends to believe and finds that these invoices were fabricated at the last minute to serve as trial exhibits.

In the months following the meeting, Sarah, Russell, the comptroller, and the outside CPAs conducted an extensive analysis of the financial condition of LP including looking at every invoice in the files and every purchase order to ensure that every legitimate transaction was properly documented and accounted for. They identified 131 undocumented checks. Their investigation also indicated that most, if not all, of these 131 checks were payable to Defendant or one of his entities, or on behalf of Defendant or one of his entities. Both Sarah Franklin and Defendant testified at trial about each of the 131 checks. Appendix A[5] lists these checks and contains the Court's comments on the evidence. The Court finds that Defendant made unauthorized withdrawals by check in the amount of $215,946.97. Many of the checks were not coded properly in the checkbook. For example, a check for BI storage shed rental was coded as telephone expense; payments on Defendant's personal vehicle loan were recorded as equipment rental; insurance expense for LLC was coded as inventory. The checks, with a few exceptions, were not recorded as loans or amounts payable by Defendant or his

_____

[5]Appendix A should be considered to be additional findings of fact.

Page -14-

entities.  Due to the volume of transactions, the amounts of the transactions, the missing and inadequate documentation, the omission of payees on the check stubs, and the miscoding of the account codes on the check stubs the Court finds that Defendant was attempting to conceal the transactions and intending to defraud LP.  This fact is reinforced by Defendant's use of a checkbook outside of the accounting system, and his reluctance to follow established procedures to obtain funds.

There were also direct transfers out of LP's accounts to pay Defendant's personal credit cards; Exhibit 20 shows that $34,925.07 was used to pay Defendant's personal credit cards, and the Court so finds.  The Court also finds that the documentation Defendant supplied to justify these transfers was little more than a running balance and insufficient to justify any of the reimbursements/payments as legitimate business expenses.  The Court also finds that Defendant was not authorized to make these payments.

Exhibit 21 consists of invoices given to Defendant to pass through invoices paid by LP for items properly payable by Defendant or his entities, that he caused to be paid through LP's accounting system.  Exhibit 21 shows that $55,037.59 was improperly paid by LP and billed to Defendant, and the Court so finds.

In addition, Exhibits 25(a)-(j) consist of items paid by LP for Defendant or his entities discovered or paid for after he left, so consequently had not been invoiced to him. These include:

| Exhibit | Payee | Amount | Comment |
|---------|-------|--------|---------|
| 25a | | | duplicate of check 19230 |
| 25b | Desa | 243.95 | |
| 25c | Ferguson | 580.48 | |
| 25d | Home Depot | 2316.90 | |
| 25e | Kubota | 1677.60 | Tractor payments in addition to down payment |
| 25f | | | fax in Defendant's home, court finds reasonable. |
| 25g | Rental Service Center | 1116.78 | |
| 25h | Sherwin Williams | 160.27 | |
| 25i | Unico | 6203.80 | See Ex. 25i page 8 for amount. |
| 25j | Viessman Mfg. Co. | 5974.47 | |
| 25k | | _____. | duplicate of check 19577 |
| Total other charges | | 13455.32 | |

Exhibit 22 documents amounts paid back to LP by Defendant or his entities. The Court finds that $90,319.48 was paid back.

Therefore, in summary, the Court calculates damages as follows:

| Item | Amount |
|------|--------|
| Unauthorized checks | $   215946.97 |
| Transfers to credit cards | 34925.07 |
| Unpaid pass through invoices | 55037.59 |
| Other charges | 13455.32 |
| Subtotal | 319364.95 |
| Less: Reimbursements | -90319.48 |
| Total[6] | $   229045.47 |

In the months that followed Defendant's exodus from LP, the Franklins decided to save the company and injected $388,000 into it to pay vendors and restock the inventory.

**ADDITIONAL FINDINGS**

Defendant admitted that he was shifting money between LP, BI, and LLC as needed because he viewed all three businesses as one. Furthermore, he treated LP as if he owned it 100%, and in fact told Richard Joliett that he owned it and the land on which it was located.

LP was a vulnerable target for Defendant. Its former management was incapacitated, it was on a downward cycle and it needed clear direction to turn itself around. It had unsophisticated internal controls before Defendant's arrival, and then despite the controls initiated by Defendant, he was able to

---

[6]This number substantially agrees with the expert's report, in which he opined that there was a loss of $237,000 from Defendant's misappropriations.

Page -17-

circumvent them by keeping control of the checkbook and providing either little information or misleading information to the comptroller and the outside accountants. Furthermore, LP was a family business, and the family placed their trust in Defendant to operate the business in a proper, business-like way.

The methods used by Defendant were not an appropriate way to run a business, especially on behalf of someone else. Any reasonable person would have known that in the circumstances described above that he did not own LP, and that he had no right to treat his activities as other than as an employee. Certain expenditures were clearly inappropriate, for example: insurance for non-company vehicles, improvements on Defendant's house and property, improvements on the property in Santa Fe, the tractor, personal credit cards when no detailed accounting was provided simultaneously, furniture for Defendant's home, the stove and refrigerator for Defendant's mother. Other expenditures were inappropriate under the circumstances, for example: payment of management fees without a contract and without the knowledge of the stockholders of the company, charges for tenant improvements when the costs of those improvements and the labor for them were provided by LP. The expenditures that Defendant could not remember are absolutely inappropriate and shifted the burden to explain to Defendant, which he did not do.

Case 03-01394-s    Doc 34    Filed 04/17/06    Entered 04/17/06 14:59:00 Page 19 of 39

Defendant's conduct was reprehensible and deserving of a punitive damage award.

On April 24, 2001, Wayne Berry answered interrogatories in his divorce case. Ex. 18. He listed gross income of $4,000 per month and net income after payroll taxes of $3,315 (page 21). He listed monthly expenses $10,275 (page 24). He also listed few, if any, unencumbered assets. The Court finds that Defendant was supplementing his income through unauthorized transfers from Plaintiffs in order to sustain his life style.

The Court finds that Plaintiffs Sarah Franklin and Tom Franklin did not present sufficient evidence to find for them individually on any of the Counts of the complaint. While there was incidental evidence of loans by Sarah and Tom to Defendant, they did not establish that these loans were the result of fraud, misrepresentation, embezzlement, larceny, or willful and malicious injury. Furthermore, there was no testimony from them regarding reliance on any representations, or to the exact amount of damages. The Complaint will be dismissed as to Sarah and Tom Franklin with prejudice.

**CONCLUSIONS OF LAW**

The Complaint contains 14 causes of action, plus a section entitled "Damages" and one entitled "Nondischargeability". The latter two sections specify the amount of damages, and cite the legal theories under which the debt is nondischargeable, and

Case 03-01394-s    Doc 34    Filed 04/17/06    Entered 04/17/06 14:59:00 Page 20 of 39

therefore do not constitute separate counts.  The 14 causes of action are set out as follows.

1.  Negligence.

Defendant moved to dismiss this cause of action for failure to state a claim.  The Court agrees.  Negligence does not result in a nondischargeable debt.  <u>Kawaauhau</u> 523 U.S. at 64.

2.  Negligent Misrepresentation.

Defendant also moved to dismiss this cause of action for failure to state a claim.  The Court agrees.  Negligent misrepresentation does not result in a nondischargeable debt. <u>Buck v. Woodhull (In re Woodhull)</u>, 30 B.R. 83, 86 (Bankr. E.D. Ark. 1983).

3.  Breach of Contract.

Defendant also moved to dismiss this cause of action for failure to state a claim.  The Court agrees.  A simple breach of contract is not nondischargeable; an intentional breach of contract is nondischargeable only when it is accompanied by malicious and willful tortious conduct.  <u>Petralia v. Jercich (In re Jercich)</u>, 238 F.3d 1202, 1205 (9th Cir.), <u>cert. denied</u>, 533 U.S. 930 (2001).  Count 10 is for Willful and Malicious Injury, so this claim will be dealt with there.

4.  Prima Facie Tort.

Defendant did not move to dismiss this count; the Court will do so on its own motion.  Section 523 contains an exclusive list

of what debts are nondischargeable. Prima facie tort is not one.
Unless the same conduct warrants a finding of nondischargeability
under specific subsections of section 523, the debt would be
discharged. Therefore, the Court will consider the elements of
prima facie tort under other sections of the complaint.

5. Breach of Fiduciary Duty.

The existence of a fiduciary duty for section 523(a)(4) is a
question of federal law, not a "fact" that can be pled. <u>Van de
Water v. Van de Water (In re Van de Water)</u>, 180 B.R. 283, 289
(Bankr. D. N.M. 1995)(Fiduciary capacity is a question of federal
law; the general definition of fiduciary is too broad in the
dischargeability context.); <u>Fowler Bros. v. Young (In re Young)</u>,
91 F.3d 1367, 1371 (10th Cir. 1996) ("The existence of a
fiduciary relationship under § 523(a)(4) is determined under
federal law.") In <u>Employers Workers' Compensation Assoc. v.
Kelley (In re Kelley)</u>, 215 B.R. 468, 471-72 (10th Cir. BAP 1997),
the Tenth Circuit Bankruptcy Appellate Panel discussed fiduciary
duty:

> Section 523(a)(4) of the Bankruptcy Code excepts from
> discharge any debt "for fraud or defalcation while
> acting in a fiduciary capacity." The Tenth Circuit
> recently explained the meaning of "fiduciary capacity"
> in this provision.
>> The existence of a fiduciary relationship under §
>> 523(a)(4) is determined under federal law.
>> However, state law is relevant to this inquiry.
>> Under this circuit's federal bankruptcy case law,
>> to find that a fiduciary relationship existed
>> under § 523(a)(4), the court must find that the
>> money or property on which the debt at issue was

Case 03-01394-s    Doc 34    Filed 04/17/06    Entered 04/17/06 14:59:00 Page 22 of 39

> based was entrusted to the debtor. Thus, an
> express or technical trust must be present for a
> fiduciary relationship to exist under § 523(a)(4).
> Neither a general fiduciary duty of confidence,
> trust, loyalty, and good faith, nor an inequality
> between the parties' knowledge or bargaining
> power, is sufficient to establish a fiduciary
> relationship for purposes of dischargeability.
> "Further, the fiduciary relationship must be shown
> to exist prior to the creation of the debt in
> controversy." [Allen v. Romero (In re Romero)],
> 535 F.2d [618,] 621 [(10th Cir. 1976)].
> Fowler Bros. v. Young (In re Young), 91 F.3d 1367,
> 1371-72 (10th Cir. 1996)(additional citations omitted).
> We are, of course, obliged to apply this narrow view of
> the fiduciaries who are covered by § 523(a)(4).

The Court finds that there was no fiduciary duty owed in this case. First, there was no express or technical trust. Second, there was no duty owed before the creation of the debt in controversy. While there may have been common law fiduciary duties based on the family or business relationship, these do not qualify for Section 523(a)(4) purposes. Count 5 should be dismissed.

6. Fraud.

The Court finds that Plaintiffs have not established that they are entitled to a fraud judgment. While there may have been misrepresentations, the relief awarded under count 8 moots any claim for fraud damages.

7. Conversion.

The Court finds that this conversion claim is mooted by the relief granted under count 8, so will not discuss conversion.

8. Embezzlement.

The Court finds that Plaintiffs have met their burden of proof in showing that Defendant embezzled the sum of $319,364.95 from LP. Defendant should be allowed an offset of $90.319.48 for amounts returned, leaving a balance due of $229,045.47.

9.   Larceny.

Alternatively, the Court finds that Plaintiffs have met their burden of proof in showing that Defendant obtained $229,045.47 through larceny.

10.   Willful and Malicious Injury.

The Court finds that Plaintiffs did not meet their burden of proof in establishing that the injuries to LP were willful and malicious. While the degree of embezzlement/larceny indicates that it was certain to lead to injury, the Court cannot find that Defendant intentionally set out to damage LP. Therefore, there will be no award for the decrease in the value of the business that transpired while Defendant was president. Count 10 will be dismissed.

11.   Restitution, Quantum Meruit and Unjust Enrichment.

Defendant also moved to dismiss this cause of action for failure to state a claim. The Court agrees. Section 523 contains an exclusive list of what debts are nondischargeable. Restitution, quantum meruit and unjust enrichment are not listed. Unless the same conduct warrants a finding of nondischargeability under specific subsections of section 523, the debt would be

Page -23-

discharged. Therefore, the Court will consider the elements of restitution, quantum meruit and unjust enrichment under other sections of the complaint.

12. Conversion.

The Court finds that this conversion claim is mooted by the relief granted under count 8, so will not discuss conversion.

13. Fraudulent Transfer.

Fraudulent transfers of assets from LP would result in a nondischargeable debt only if those transfers fit under sections 523(a)(2), (4), or (6). Count 13 will be dismissed.

14. Alter Ego/Veil Piercing.

Defendant also moved to dismiss this cause of action for failure to state a claim. The Court agrees. First, it is not an action under section 523 to hold a debt nondischargeable. Rather, this count seeks to disregard the corporate forms of Berry, Inc. and W.M. Berry, L.L.C. and declare that they should be held jointly and severally liable with Defendant on their debt. To the extent this count seeks to enhance assets of the estate, Plaintiffs lack standing.

> Property of the estate does not belong to any
> individual creditor. If under governing state law the
> debtor could have asserted an alter ego claim to pierce
> its own corporate veil, that claim constitutes property
> of the bankrupt estate and can only be asserted by the
> trustee or the debtor-in-possession. As this Court
> stated:
>> Under the Bankruptcy Code, the bankruptcy trustee
>> may bring claims founded ... on the rights of the
>> debtor and on certain rights of the debtor's

Page -24-

> creditors. Whether the rights belong to the
> debtor or the individual creditors is a question
> of state law ... If a claim is a general one, with
> no particularized injury arising from it, and if
> that claim could be brought by any creditor of the
> debtor, the trustee is the proper person to assert
> the claim, and the creditors are bound by the
> outcome of the trustee's action.

Kalb, Voorhis & Co. v. American Financial Corp., 8 F.3d 130, 132

(2nd Cir. 1993)(Footnote and citations omitted.) Only

Defendant's chapter 7 bankruptcy trustee may pursue this action.

See generally In re 7RCCI, Inc., No. 11-95-10590, slip op. at 7-8

(Bankr. D. N.M. Dec. 18, 1998).

Furthermore, the Court finds that Plaintiffs did not prove

the required 3 elements to pierce the corporate veil: a showing

of instrumentality or domination, improper purpose, and proximate

causation. See Scott v. AZL Resources, Inc., 107 N.M. 118, 121,

753 P.2d 897, 900 (1988). Count 14 should be dismissed.

**INTEREST**

Under New Mexico law, prejudgment interest is an element of

damages. Foster v. Luce, 115 N.M. 331, 335, 850 P.2d 1034, 1038

(Ct.App. 1993). Plaintiff LP should receive prejudgment interest

on its damages from February 5, 2002 at the rate of 10% per year.

The judgment will reflect interest at the federal judgment rate

from the date of entry.

**PUNITIVE DAMAGES**

> Reprehensibility is the most important guidepost for
> determining the reasonableness of a punitive damage
> award. [I]n assessing the reprehensibility of a

Page -25-

defendant's conduct, we ask whether the conduct: causes
economic harm rather than physical harm; would be
considered unlawful in all states; involves repeated
acts rather than a single one; is intentional; involves
deliberate false statements rather than omissions; and
is aimed at a vulnerable target.

United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219,

1229 (10th Cir. 2000)(Citations and internal punctuation

omitted). While Defendant's conduct here caused economic harm, a

mitigating factor, the rest of his conduct suggests that a large

punitive damage award would be appropriate. Embezzlement and

larceny are unlawful in all states. Defendant's actions included

a series of hundreds of misdeeds. His actions were intentional

and taken with disregard of the welfare of the victim. His

actions included deliberate false statements, including

falsifying financial statements to avoid detection,

misrepresenting the ownership of LP, and even fabricating

invoices at the last minute before trial. Finally, LP was a

vulnerable target. Total damages awarded above were $229,045.47.

The Court finds that an award of an additional $229,045.47 would

be an appropriate punishment in these circumstances.

**CONCLUSION**

The complaint will be dismissed as to Berry, Inc. and Berry,

LLC. Plaintiffs Tom and Sarah Franklin shall take nothing.

Plaintiff LP shall be awarded judgment for damages, punitive

damages, pre- and post-judgment interest, and said judgment will

be nondischargeable in Defendant's chapter 7 bankruptcy case.

Page -26-

_(signature)_

Honorable James S. Starzynski
United States Bankruptcy Judge


I hereby certify that on April 17, 2006, a true and correct copy
of the foregoing was electronically transmitted, faxed,
delivered, or mailed to the listed counsel and/or parties.

Thomas D Walker
500 Marquette Ave NW Ste 650
Albuquerque, NM 87102-5309

P Scott Eaton
PO Box 25305
Albuquerque, NM 87125-0305

Daniel J Behles
226-A Cynthia Loop NW
Albuquerque, NM 87114-1100

Michael Allison
1400 Central Ave SE Ste 2200
Albuquerque, NM 87106-4857


_(signature) James E. Burke_

Case 03-01394-s    Doc 34    Filed 04/17/06    Entered 04/17/06 14:59:00 Page 28 of 39

**APPENDIX A**

Key:
    † = Defendant testified he was not sure what the expense was.
    ‡ = Court was satisfied that this was a legitimate expense.

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|------|--------|-------|--------|------------|----------|---------|
| 3/15/00 | 19015 | Travelers | 600.96 | Inventory | liability insurance for BI | |
| 3/15/00 | 19016 | Zurich | 128.94 | Inventory | insurance for LLC's Santa Fe building | |
| 3/21/00 | 19018 | BI | 850.00 | Subcontract | † | |
| 3/22/00 | 19036 | BI | 1800.00 | | † | |
| 3/27/00 | 19038 | Cash | 300.00 | Bonuses | ‡ - employees worked Saturday to move | 300.00 |
| 3/30/00 | 19044 | Travelers | 563.59 | | insurance for BI | |
| 3/31/00 | 19051 | Petty Cash | 100.00 | | † - no receipts, no real explanation | |
| 4/10/00 | 19061 | Cash | 100.00 | Travel Exp. | ‡ - travel to Denver re: acquisition | 100.00 |
| 4/17/00 | 19078 | Wayne Berry | 2045.00 | Equipment | ‡ - sold old chassis to LP to make service chassis, was on premises when he left.  Cf. Ex. Q. | 2045.00 |
| 4/21/00 | 19084 | Cash | 177.50 | Temp labor | ‡ - work on new building | 177.50 |
| 4/24/00 | 19088 | Sisco | 47.87 | Inventory | ‡ - sprinkler head, Luther did not finish landscaping | 47.87 |
| 4/26/00 | 19124 | Wayne Berry | 750.00 | Truck exp | Defendant testified for an air compressor, cf. Ex. S, but no air compressor on premises | |
| 4/28/00 | 19135 | Cash | 500.00 | Petty Cash | no documentation | |

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|------|--------|-------|--------|------------|----------|---------|
| 5/09/00 | 19149 | BI | 442.94 | Inventory | Ex. T says charging for the Crash Fire Project; depo testimony said for pipes purchased for LP job. Insufficient documentation. | |
| 5/11/00 | 19150 | Airtouch | 883.03 | Cell phone | Cell phone for BI; no breakdown for LP use.  Insufficient documentation. | |
| 5/11/00 | 19151 | IHES | 1276.75 | Vehicle exp | †  Check says Cartwright's expense. | |
| 5/17/00 | 19166 | Cash | 150.00 | | † | |
| 5/17/00 | 19167 | BI | 561.50 | Subcontract | BI invoice. Insufficient documentation. | |
| 5/24/00 | 19185 | ATT Universal Card | 839.64 | Office exp | Wayne Berry's personal credit card. Insufficient documentation. | |
| 5/25/00 | 19187 | IHES | 328.53 | Vehicle exp | †.  Check has same account reference as check 19151. | |
| 5/25/00 | 19189 | Storage USA | 273.59 | Telephone | BI's storage unit. | |
| 5/26/00 | 19191 | cash | 156.32 | Travel | †.  No documentation. | |
| 6/01/00 | 19200 | Zurich | 180.41 | Insurance | LLC insurance. | |
| 6/2/00 | 19201 | cash | 180.00 | Temp labor | No documentation. | |
| 6/5/00 | 19205 | BI | 1973.07 | Subcontract | Defendant could not recall at deposition.  At trial, produced Exhibit W.  Insufficient documentation.  Crash fire management fee. | |
| 6/8/00 | 19214 | BI | 400.00 | Subcontract | ‡.  Exhibit X.  Inventory resold by LP. | 400.00 |

Case 03-01394-s   Doc 34   Filed 04/17/06   Entered 04/17/06 14:59:00 Page 30 of 39

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|------|--------|-------|--------|-----------|----------|---------|
| 6/15/00 | 19230 | Cunningham | 868.00 | Inventory | †.  Refrigerator and stove given to Defendant's mother. | |
| 6/15/00 | 19243 | Joelle Jones | 40.00 | Temp labor | Defendant could not recall at deposition.  This check was to his babysitter. | |
| 6/19/00 | 19251 | cash | 182.37 | Travel | †.  Insufficient documentation. | |
| 6/19/00 | 19252 | Wayne Berry | 450.00 | Travel | ‡.  Travel to Colorado convention. | 450.00 |
| 6/19/00 | 19253 | Wayne Berry | 2275.00 | Equipment | Defendant could not recall at deposition. Defendant testified at trial this was for a tool trailer. None on premises when he left. | |
| 7/7/00 | 19284 | cash | 600.00 | U haul job | ‡.  Money for U haul job in Phoenix. Ex DD. | 600.00 |
| 7/12/00 | 19290 | cash | 600.00 | Travel-u haul job | ‡.  Phoenix job. | 600.00 |
| 7/14/00 | 19303 | cash | 600.00 | U haul job | ‡.  Phoenix job. | 600.00 |
| 7/14/00 | 19304 | BI | 2350.00 | | Defendant could not recall at deposition.  Crash fire management fee – insufficient documentation. | |
| 7/17/00 | 19314 | cash | 100.00 | Russ convention | ‡.  Russell's convention expenses. | 100.00 |
| 7/18/00 | 19316 | Citibank | 1000.00 | Travel exp. | Defendant's personal credit card. | |
| 7/18/00 | 19317 | Providian | 590.00 | Airline tickets school | Defendant's personal credit card. | |

Case 03-01394-s   Doc 34   Filed 04/17/06   Entered 04/17/06 14:59:00 Page 31 of 39

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|------|--------|-------|--------|-----------|----------|---------|
| 7/18/00 | 19318 | ATT Universal Card Universal Card | 580.37 | Travel exp. | Defendant's personal credit card. | |
| 7/27/00 | 19334 | Wayne Berry | 500.00 | | ‡. Defendant billed LP and LP billed Colorado Tank, who paid. | 500.00 |
| 7/27/00 | 19335 | LLC | 187.63 | | † | |
| 8/10/00 | 19388 | Bank of Santa Fe | 1269.62 | Equipment rental Uhaul | Defendant's truck payment. See also Ex. 18, p. 16 (listing truck payment as a work benefit in his divorce case.) | |
| 8/15/00 | 19390 | Storage USA | 560.10 | Container for fire training job | BI's storage unit. | |
| 8/14/00 | 19392 | Comdata Corp | 773.06 | Vehicle exp. | Defendant testified used Cartwright's gas credit card, but no breakdown. Insufficient documentation. | |
| 8/15/00 | 19403 | BI | 1300.00 | Subcontract | Crash fire management fee. | |
| 8/16/00 | 19407 | LLC | 3800.00 | Loan | unauthorized loan; repaid on general ledger, Exhibit SSSS page 3. | |
| 8/16/00 | 19408 | Wayne Berry | 1046.82 | | † | |
| 8/18/00 | 19409 | cash | 300.00 | Travel Seattle | ‡. Travel to Seattle re: possible acquisition. | 300.00 |
| 9/8/00 | 19455 | Cash | 152.16 | Travel | † | |
| 9/14/00 | 19464 | Wayne Berry | 518.00 | | † | |

Page -4-

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|---|---|---|---|---|---|---|
| 9/20/00 | 19481 | BI | 2450.00 | Subcontract | Defendant could not recall at deposition.  At trial produced Exhibit HH, crash fire project invoice.  Insufficient documentation. | |
| 9/22/00 | 19508 | Citibank | 3750.00 | Computer travel exp. | Defendant's personal credit card, used to purchase home computer. | |
| 09/21/00 | 19515 | Wayne Berry | 2287.00 | Subcontract | Exhibit KK, crash fire project, insufficient documentation. | |
| 10/02/00 | 19529 | TLC Plumbing | 7506.98 | Leasehold improvements | ‡.  Work on new LP building. (This charge probably should have been paid by Luther.) | 7506.98 |
| 10/05/00 | 19539 | ELC Security Products | 463.66 | Inventory | Security system for Defendant's house. | |
| 10/06/00 | 19544 | Brent Gossett | 1200.00 | Inventory | ‡.  Meter parts and equipment, put in inventory, resold by LP. | 1200.00 |
| 10/10/00 | 19557 | BI | 1250.00 | Subcontract | Management fee. | |
| 10/10/00 | 19558 | Discover | 500.00 | Travel | Defendant's personal credit card. | |
| 10/10/00 | 19572 | Bank of Santa Fe | 1909.43 | Vehicle expense | Defendant's truck payment. | |
| 10/11/00 | 19577 | Bank of America | 20724.26 | | Defendant used this check to obtain a cashiers check to repay a personal loan to Sarah.  See also Exhibit 25K. | |
| 10/18/00 | 19591 | BI | 1830.00 | Subcontract | Management fee. | |

Page  -5-

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|------|--------|-------|--------|-----------|----------|---------|
| 10/18/00 | 19592 | LLC | 125.00 | Reimbursement | Defendant did not recall at deposition.  At trial he testified it was for a permit.  Sarah testified they never had the permit. | |
| 10/20/00 | 19612 | Action RV | 346.91 | | †.  Trailer hitch for Defendant's trailer. | |
| 11/08/00 | 19679 | USAA Federal Savings Bank | 1625.00 | Office furniture. | ‡.  Office furniture for Defendant and Rich, charged on Defendant's personal credit card and reimbursed. | 1625.00 |
| 11/10/00 | 19682 | Citibank | 1000.00 | Travel | Defendant's personal credit card. | |
| 11/10/00 | 19683 | Discover | 1000.00 | Travel | Defendant's personal credit card. | |
| 11/13/00 | 19686 | BI | 542.00 | Subcontract | Management fee. | |
| 11/17/00 | 19688 | BI | 3015.00 | Subcontract | Management fee. | |
| 11/21/00 | 20036 | Barrow Services | 3000.00 | | †.  No documentation. | |
| 11/28/00 | 19691 | Cash | 300.00 | Petty cash | No documentation. | |
| 11/30/00 | 19692 | Wayne Berry | 1000.00 | | Management fee.  See Ex. YY page 2. | |
| 12/01/00 | 19694 | A-1 Signs | 1483.06 | Leasehold improvements | Sign for Cartwrights in Santa Fe. | |
| 12/06/00 | 19695 | Ernie Vigil Roofing | 6812.00 | Leasehold improvements | Roof on Defendant's property. | |
| 12/06/00 | 19697 | Doyle Roof Masters | 300.00 | Leasehold improvements | ‡. Leak on LP's building. | 300.00 |

Case 03-01394-s   Doc 34   Filed 04/17/06   Entered 04/17/06 14:59:00 Page 34 of 39

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|------|--------|-------|--------|-----------|----------|---------|
| 12/06/00 | 19698 | Storage USA | 407.19 | Construction costs | BI's storage shed. | |
| 12/09/00 | 19699 | Metal Depot | 206.91 | Materials | Supplies for both LP & Defendant's house, no breakdown, insufficient documentation. | |
| 12/08/00 | 19700 | Ray Jahannsan | 206.91 | Subcontract labor | Labor at both LP & Defendant's house, no breakdown, insufficient documentation. | |
| 12/08/00 | 19701 | Jeff Barrows | 2870.00 | Subcontract labor | Construction at both LP & Defendant's house, no breakdown, insufficient documentation. | |
| 12/11/00 | 19702 | Costco | 1965.86 | Computer | Home computer for Defendant. | |
| 12/13/00 | 19703 | Wayne Berry | 1500.00 | | † | |
| 12/18/00 | 19704 | BI | 2627.00 | | † | |
| 12/21/00 | 19706 | Liens, Inc. | 1513.03 | Legal fees | Either all Cartwright's expense, or possibly some LP expense, but no breakdown, insufficient documentation. | |
| 12/23/00 | 19707 | Mesa Tractor | 3125.00 | Tractor | Down payment on Defendant's home tractor. See Ex. 18, p. 13 (divorce asset worksheet) | |
| 12/29/00 | 19708 | BI | 884.00 | Subcontract | † | |
| 1/3/01 | 19709 | Metal Depot | 312.80 | Inventory | ‡.  Metal gates at LP. | 312.80 |
| 1/3/01 | 19710 | Barrow Services | 798.00 | Subcontract | Work on Defendant's house, probably fencing. | |

Page  -7-

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|---|---|---|---|---|---|---|
| 1/18/01 | 19712 | Furniture Row | 1296.30 | | Furniture for Defendant's home. | |
| 1/18/01 | 19713 | Bank of Santa Fe | 1939.43 | Vehicle expense | Defendant's truck payment. | |
| 1/22/01 | 19714 | BI | 1840.00 | Subcontract | ‡.  Exhibit TT - U haul job. | 1840.00 |
| 2/01/01 | 19715 | BI | 2000.00 | Subcontract | † | |
| 2/10/01 | 19716 | Storage USA | 152.91 | Construction | BI's storage unit. | |
| 2/20/01 | 19717 | BI | 2641.00 | Subcontract | Management fee. | |
| 3/5/01 | 19719 | BI | 1017.00 | | ‡.  Tenant Improvements.  Exhibit JJJ. | 1017.00 |
| 3/7/01 | 19720 | LLC | 10000.00 | Loan | Unauthorized loan for divorce attorney. | |
| 3/15/01 | 19721 | BI | 2817.00 | Subcontract | † | |
| 3/15/01 | 19722 | Wayne Berry | 733.00 | Reimbursement | †.  No documents. | |
| 3/16/01 | 19723 | USAA Savings Bank | 200.00 | Office supplies | Defendant's personal credit card. | |
| 3/20/01 | 19724 | Academy Furniture | 1541.06 | | Furniture for Defendant's house. | |
| 3/21/01 | 19725 | Wayne Berry | 2500.00 | | † | |
| 3/26/00 | 19727 | BI | 3780.00 | | † | |
| 3/28/01 | 20508 | AA Sanchez | 1800.00 | | Work on both LP building and Defendant's house, but no breakdown given.  Insufficient documentation. | |

Case 03-01394-s   Doc 34   Filed 04/17/06   Entered 04/17/06 14:59:00 Page 36 of 39

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|------|--------|-------|--------|-----------|----------|---------|
| 4/6/01 | 19728 | Cash | 300.00 | | † | |
| 4/6/01 | 19729 | Frame N Art | 1534.03 | | Defendant framed his Tae Kwan Do certificates. | |
| 4/11/01 | 19730 | Sam's Club | 750.00 | | †.  Groceries for Defendant. | |
| 4/13/01 | 19731 | LLC | 14000.00 | Loan | Unauthorized loan. $10,000 was repaid from a subsequent $11,000 loan by Sarah to Defendant.  She is still owed the $11,000, however. | |
| 4/13/01 | 19732 | cash | 318.31 | TI-labor | no documentation. | |
| 4/20/01 | 19733 | BI | 3728.85 | TI-wall | Sarah testified that no tenant improvements were ongoing at this time.  Furthermore, when there were TI going on, LP paid for the materials and provided the labor with LP employees.  BI would have no claim for TI. | |
| 5/02/01 | 19734 | BI | 6325.00 | | no documentation. | |
| 5/2/01 | 19735 | Wayne Berry | 2000.00 | Reimbursement | † | |
| 5/2/01 | 19736 | Bank of Santa Fe | 1959.43 | | Defendant's truck payments. | |
| 5/3/01 | 19737 | BI | 4327.00 | TI | No tenant improvements at this time. No documentation. | |
| 5/10/01 | 19738 | BI | 3871.00 | TI | No tenant improvements at this time. No documentation. | |
| 5/22/01 | 19739 | BI | 2145.00 | TI | No tenant improvements at this time. No documentation. | |

Case 03-01394-s   Doc 34   Filed 04/17/06   Entered 04/17/06 14:59:00 Page 37 of 39

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|------|--------|-------|--------|------------|----------|---------|
| 5/22/01 | 19740 | BI | 2010.00 | TI | No tenant improvements at this time. No documentation. | |
| 6/01/01 | 19742 | cash | 200.00 | TI labor | No tenant improvements at this time. No documentation. | |
| 6/7/01 | 20733 | BI | 1500.00 | | † | |
| 6/19/01 | 19743 | BI | 5187.00 | TI | No tenant improvements at this time. No documentation. | |
| 7/8/01 | 19744 | Costco | 84.65 | Membership | ‡ | 84.65 |
| 7/10/01 | 19745 | BI | 5782.00 | TI | No documentation. | |
| 7/13/01 | 19746 | cash | 200.00 | Temp. labor | No documentation. | |
| 7/13/01 | 19747 | Storage USA | 274.73 | Construction | BI's storage shed. | |
| 7/17/01 | 19749 | BI | 1787.00 | TI | No documentation. | |
| 7/27/01 | 19750 | Cash | 300.00 | | † | |
| 7/27/01 | 19751 | BI | 9539.19 | | Defendant thought TI, but no documentation. | |
| 7/28/01 | 19752 | Discover Card | 500.00 | | Defendant's personal credit card. | |
| 8/6/01 | 19753 | BI | 10848.29 | | No documentation. | |
| 9/11/01 | 20976 | Sams Club | 915.77 | | † | |
| 9/17/01 | 19756 | LLC | 3872.00 | | Unauthorized loan. | |
| 10/05/01 | 19760 | Storage USA | 447.05 | | BI's storage shed. | |
| Total claimed unauthorized checks | | | 236053.77 | | Total authorized | 20106.80 |

Case 03-01394-s   Doc 34   Filed 04/17/06   Entered 04/17/06 14:59:00 Page 38 of 39

| Date | Number | Payee | Amount | Check Stub | Comments | Allowed |
|------|--------|-------|--------|-----------|----------|---------|
| Less: Authorized | | | <u>-20106.80</u> | | | |
| Total unauthorized checks | | | 215946.97 | | | |

Case 03-01394-s    Doc 34    Filed 04/17/06    Entered 04/17/06 14:59:00 Page 39 of 39